UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| FARRELL CHERRY,<br><br>                    Plaintiff,<br><br>          vs.<br><br>SIEMENS HEALTHCARE<br>DIAGNOSTICS, INC.,<br><br>                    Defendant. | CIV. 13-5057-JLV<br><br><br>ORDER |

Plaintiff Farrell Cherry filed a multi-count amended complaint against the defendant, Siemens Healthcare Diagnostics, Inc., his former employer.   (Docket 8).   Mr. Cherry alleges unlawful discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 20003 *et seq.*, including disparate treatment and disparate impact on the basis of race.[1]   Id.   Defendant denies it discriminated against Mr. Cherry.   (Docket 17).   This matter is presently before the court on defendant's motion for summary judgment as to all counts.   (Docket 31). Plaintiff resists defendant's motion in its entirety.   (Docket 46).   For the reasons stated in this order, defendant's motion for summary judgment is granted.

**STANDARD OF REVIEW**

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show[] that there is no genuine dispute as to any material fact

---

[1]The amended complaint includes an allegation of disparate treatment on the basis of race.   (Docket 8 at ¶ 20).   Mr. Cherry is not pursuing that claim. (Dockets 33 at ¶ 172; 47 at ¶ 172).

and the movant is entitled to judgment as a matter of law."   Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).   Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.   Id. at 248.   Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.   Id.   However, the moving party is entitled to judgment as a matter of law if the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   "There can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   Id. at 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the

2

nonmoving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).   In order to withstand a motion for summary judgment, the nonmoving party "must substantiate [her] allegations with 'sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy.' "   Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (citing Gregory v. Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993)).   "A mere scintilla of evidence is insufficient to avoid summary judgment."   Moody, 23 F.3d at 1412.   The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."   Anderson, 477 U.S. at 251-52.

Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists.   Id. at 256; see also Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) ("The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial.   Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no genuine issue for trial.") (internal quotation marks and citation omitted).   The non-moving party's own conclusions, without supporting evidence, are insufficient to create a genuine issue of material fact. Anderson, 477 U.S. at 256; Thomas, 483 F.3d at 527; Torgerson, 643 F.3d at 1042.

## UNDISPUTED MATERIAL FACTS

The following recitation consists of the material facts undisputed by the parties.   These facts are developed from the amended complaint (Docket 8), defendant's answer (Docket 17), defendant's statement of undisputed material facts (Docket 33), and plaintiff's response to defendant's statement of undisputed material facts and additional statement of undisputed material facts (Docket 47).   Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document.

Siemens Healthcare Diagnostics, Inc., ("Siemens") employed twenty or more employees for each working day during each of twenty or more calendar weeks in the calendar years 2012 and 2013, and is a business affecting commerce as defined under 29 U.S.C. § 630(h).   (Docket 8 ¶ 4; 17 ¶ 4).   Mr. Cherry is an African-American.   (Docket 8 ¶ 6).   He commenced his employment with Siemens in 1981[2] and was terminated on November 4, 2011. (Docket 17 ¶ 9).   Mr. Cherry was employed by Siemens as a senior field service

---

[2]Mr. Cherry was originally hired as a field service technician by American Hospital Supply Corporation which was later acquired by other companies and ultimately by Siemens.   (Docket 33 ¶ 4).

engineer and worked out of his home on Dark Canyon Road near Rapid City, South Dakota.[3]   Id. ¶ 8.

Siemens has a long-standing policy to provide its employees with a workplace free from unlawful discrimination and harassment, including discrimination on the basis of race.   Siemens provides a complaint procedure through which employees are to report discriminatory or unlawful treatment without retaliation.   (Docket 33 ¶ 1).   Mr. Cherry was aware of Siemens' equal employment opportunity and harassment free workplace policies.   Id. ¶ 2.   He never reported or complained of race discrimination to Siemens during his employment, although he claims he did not do so because he feared losing his job and suffering retaliation.   (Dockets 33 ¶ 3; 47 ¶ 3).

Siemens is highly regulated by the Food and Drug Administration ("FDA"). (Docket 33 ¶ 7).   Proper documentation and recordkeeping, including service call closures, permanent device records, and compliance training are important to Siemens and the FDA.   Id.; see also Docket 47 ¶ 7.   Regional Service Manager Blaine Raymer became Mr. Cherry's supervisor in February 2008. (Docket 33 ¶ 20).   At that time, Mr. Cherry was a senior engineer or Service Technician II, and his job duties included instrument repair, instrument

---

[3]Other field service engineers also worked remotely from their homes. (Docket 33 ¶ 6).

documentation, installation, MODs,[4] preventative maintenance, customer satisfaction, and problem resolution.   Id. ¶ 21.

Mr. Raymer's first performance review of Mr. Cherry was in 2009 for the calendar year 2008.   (Dockets 33 ¶ 26; 47 ¶ 26).   Mr. Raymer's 2009 performance review gave Mr. Cherry an overall rating of 3.21 or "Achieved." (Dockets 33 ¶ 27; 47 ¶ 27).   In this review, Mr. Raymer provided positive feedback regarding Mr. Cherry's performance.   Mr. Raymer complimented him on customer service, work ethic, call escalation, and noted Mr. Cherry was making "great strides" in completing "administrative duties in a timely manner." (Docket 33 ¶ 28).   Mr. Cherry felt the majority of Mr. Raymer's comments in the 2009 review were good, but there were some comments with which he disagreed. (Docket 47 ¶ 29).

In the 2010 performance review for the calendar year 2009, Mr. Raymer gave Mr. Cherry an overall rating of 2 or "Partially Achieved."   (Docket 33 ¶ 30). In this review, Mr. Raymer praised Mr. Cherry for having "extreme drive to satisfy customers" but also noted "negative feedback from peers[5] regarding attention to detail and troubleshooting approach," "consistent late and poor quality admin

---

[4]MODs are a form of customer service provided by Siemens which involved working with machinery or equipment to improve performance or to address safety and FDA issues.   (Dockets 33 ¶ 22; 47 ¶ 22).

[5]Mr. Cherry believes the only peer referenced was Mr. Eide, another employee supervised by Mr. Raymer.   (Docket 47 ¶ 31).

6

[sic] duties," and "written warning to address admin [sic] deficiencies with minimal progress to improve performance."   Id. ¶ 31.

In the 2011 performance review for the calendar year 2010, Mr. Raymer gave Mr. Cherry an overall rating of 2 or "Partially Achieved."   Id. ¶ 32.   In this review, Mr. Raymer complimented Mr. Cherry for "work[ing] well with sales and technical partners," "provid[ing] highly responsive service in his territory," and having "a willingness to do whatever it takes to fix a customer."   Id. ¶ 33.   Mr. Raymer noted Mr. Cherry's "administrative work is poor quality.   Kronos[6] time reporting is often inaccurate and much follow up is required. Expense reports come sporadically and have been rejected for inaccuracies."   Id.   Mr. Raymer also wrote:

> Farrell [Cherry] needs much greater focus on details.   Farrell needs to change his bad work habits.   Farrell needs to take ownership for everything that he is responsible for as Farrell always has excuses for not completing tasks in the time allowed, such as AT&T doesn't work out here, my internet doesn't work at my house, my Prism[7] is broken, my computer isn't working, I can't log on, I've taken the training eight times and it still says due.   Farrell was paid 66 and a quarter hours for @helpdesk this past year which has not mitigated his IT challenges or excuses.   Farrell occasionally completes Kronos time reporting correctly the first time.   Farrell had a very stable territory to cover this year with zero incremental performance improvement. Farrell creates additional work for many.   The call

_____

[6]KRONOS is a system to document the amount of time spent on service calls.   (Docket 47 ¶236).

[7]PRISM is a portable wireless device implemented in 2010 that enabled Field Service Engineers to complete service reports and wirelessly transmit information regarding service calls, including call closures.   (Docket 33 ¶ 52). Mr. Cherry got a replacement PRISM device after he requested one, without having Mr. Raymer intervene on his behalf.   Id. ¶ 54.

> center makes additional contact frequently to get ETA information. Calls closed can be inaccurate as Farrell is always working in the past. . . .
>
> Farrell provides highly responsive service in his territory, mainly to one account at Rapid City Regional. Farrell had 456 hours of overtime, 40.5 percent of his OT, overtime, was due to weekend service as he is on call 50 percent of the time. The inability to maintain uptime at medium volume accounts continues the need for localized on call.   Farrell has a willingness to do whatever it takes to fix a customer.   In one instance he was willing to get parts locally as a StreamLab wiring harness was not available and the customer was down   for   several   days.    Unfortunately   the   problem   was misdiagnosed and a fuse needed to be replaced.

(Docket 47 ¶¶ 240 & 302).   Mr. Cherry received and signed off on his 2011 performance review.[8]   (Docket 33 ¶ 34).   Mr. Cherry admits he received praise from Mr. Raymer and that he put Mr. Cherry up for an "attaboy" from Siemens when he performed well.   Id. ¶ 24.

In October 2011, Siemens decided to conduct a reduction in force ("RIF") because of a lack of sales growth and for other business reasons, including a need to become more competitive in its pricing.[9]   Id. ¶ 59.   The RIF was a company-wide initiative and impacted all business units.   Id. ¶ 60.   Siemens planned to reduce the employee count in the Sales, Service & Technical Group by approximately 113 out of a total decisional unit of approximately 940

---

[8]Mr. Cherry claims he did not actually get a chance to read his 2011 evaluation as he was troubleshooting an instrument at the same time and just signed off on the review because there was a time constraint involved.   (Docket 47 ¶ 34).

[9]Mr. Cherry acknowledged these business reasons existed to justify a RIF, but claims it also had to occur because Siemens had merged three companies and was top heavy on management.   (Docket 47 ¶ 59).

employees.[10]   Id.   That same month senior management instructed vice presidents, including Larry Camela then-Vice President of Service for the United States and Canada, that they would have to reduce employee count.   Id. ¶ 61.

Shortly after Mr. Camela learned of the RIF, Service Director David Siebert, who was Mr. Raymer's direct supervisor and who reported to Mr. Camela, was informed of the RIF.   Id. ¶ 63.   Mr. Camela and Mr. Siebert were bound by a confidentiality agreement that prohibited sharing information regarding the RIF with employees below Director level during the decision-making process.   Id. ¶ 64.   At the time the RIF selections were made, Mr. Camela's territory was designed as the West, Northeast, Southeast, and Central Regions and employed 667 field service engineers.[11]   Id. ¶ 85.   Mr. Siebert's territory, the Central Region, included South Dakota, Minnesota, Wisconsin, Illinois, Michigan and

---

[10]Mr. Cherry's response to the defendant's statement of material facts often indicated either "not disputed" or "partially disputed" and then offers additional information.   See i.e., Docket 47 ¶¶ 60 & 65.   Mr. Cherry's additional facts will be included where appropriate in the presentation of the undisputed material facts.

[11]Mr. Cherry acknowledges he has no basis to dispute Siemens' data but objects to the inclusion of this information as being immaterial for summary judgment purposes.   (Docket 47 ¶ 85).   Mr. Cherry did not conduct any discovery relating to Siemens' RIF racial demographics data.   (Dockets 33 ¶ 82; 47 ¶ 82).   Furthermore, Mr. Cherry has not filed a motion under Fed. R. Civ. P. 56(d) seeking additional time to conduct discovery in this area.   Both Rule 56(e) and D.S.D. Civ. LR 56.1(B) require a party to identify and refute an opposing party's statement of undisputed material fact.   A statement of material fact "will be deemed to be admitted unless controverted by the opposing party's statement of material facts."   LR 56.1(D).   Mr. Cherry's objections to all of Siemens' racial demographics data are overruled.

Indiana.  Id. ¶ 156.   Mr. Raymer's territory included Minnesota, North Dakota, South Dakota, Wisconsin, Wyoming, Nebraska and portions of Iowa.  Id. ¶ 92.

Mr. Camela worked with Human Resources ("HR") to confirm the criteria to be applied in selecting employees for inclusion in the RIF.   He was on a corporate team which determined the number of field service employees to be included in the RIF.  Id. at ¶ 65.   The primary criterion agreed upon for selection of employees to be included in the RIF was performance, and directors were instructed to consider employee performance over the course of the past three (3) years.  Id. at ¶ 68.   Only if a decision could not be made based on performance were other criteria such as seniority to be considered.  Id. at ¶ 69. Overtime, customer evaluations, skill sets and salary information were not considered in RIF selection criteria.  Id. ¶ 70.   The identification of individual employees to be included in the RIF in Mr. Camela's territory was the responsibility of directors, including Mr. Siebert.  Id. ¶ 66.

Mr. Siebert was informed he needed to select five employees from the units under his supervision to be included in the RIF.  Id. at ¶ 67.   Mr. Siebert testified he worked with HR Business Partner Michael Bolinger and Mr. Camela in selecting the employees in his territory who were to be included in the RIF.[12] Id. ¶ 71.   Mr. Siebert obtained permission to include in his RIF numbers two employees who had elected to retire.  Id. ¶ 72.   Mr. Siebert based his decision

_____

[12]Mr. Bolinger does not recall any discussions with Mr. Siebert about the RIF.  (Docket 47 ¶ 71).   Mr. Bolinger did have discussions with Mr. Camela about Mr. Siebert's employee choices for inclusion in the RIF.  Id.

10

solely on performance, without considering seniority, and chose the three lowest performers in his region for inclusion in the RIF.   Id. ¶ 73.   The three employees chosen by Mr. Siebert for RIF termination were Mr. Cherry and two employees who were white.   Id. ¶ 81.   Mr. Camela and Mr. Siebert discussed the reasons to RIF each employee selected.   Id. ¶ 74.   Mr. Camela had to meet certain percentage targets, so he let directors like Mr. Siebert select the candidates for inclusion in the RIF.   (Docket 47 ¶ 74).

Mr. Raymer had no knowledge of Siemens' plans to implement the RIF until November 2, 2011–after employees who were to be included in the RIF had already been selected by directors and approved by vice presidents and HR.   Id. ¶ 89.[13]   Mr. Siebert assigned Mr. Raymer the task of notifying Mr. Cherry of his termination under the RIF.   Id. ¶ 95.   On November 4, 2011, Mr. Raymer informed Mr. Cherry his employment was being terminated pursuant to the RIF. Id. ¶ 96.

Of 495 Caucasian field service engineers, 32 were included in the RIF.   Id. ¶ 87.   Of 50 African-American field service engineers, 3 were included in the RIF, including Mr. Cherry.   Id.   ¶ 86.   In the Central Region where Mr. Cherry was employed, he was the only African-American senior field service engineer selected for the RIF.   Id. ¶ 88.   Six Caucasian employees in the Central Region

---

[13]Plaintiff's objection and references to the record do not address the fact stated.   (Docket 47 ¶ 89).   See also D.S.D. Civ. LR 56.1(D).

were selected for the RIF.   Id.   The RIF resulted in the termination of 86 employees of Sales, Service & Technical Group.[14]   Id. ¶ 62.

Mr. Cherry believes he was terminated because of his race.[15]   (Docket 8 ¶ 20).   At the time of his termination, Mr. Cherry was qualified for the Senior Field Service Engineer position he held with Siemens.   (Docket 47 ¶ 179). Defendant admits Mr. Cherry was terminated as a part of the RIF and not because of any specific misconduct or policy violation by plaintiff.   Id.

Mr. Cherry had been Siemens' only field service engineer in the Rapid City and western South Dakota area for years.   Id. ¶ 182.   Dave Eide was hired by Siemens in 2008.   Id. ¶ 183.   Shortly after being hired as a co-worker of Mr. Cherry in Rapid City, Mr. Eide began to constantly criticize plaintiff to Mr. Raymer, their mutual supervisor.   Id. ¶ 186.   Mr. Eide complained he had to work weekends because plaintiff did not thoroughly fix his instruments, did not have the best technical skills, was not good at preventative maintenance, did not have the right work ethic, particularly to fix a problem the first time around, his efficiency was poor, and plaintiff just put band-aids on equipment to get it

---

[14]The remainder of the reduction in employee count for the Sales, Service & Technical Group was achieved through other forms of attrition including retirement and not backfilling separated employees.   (Docket 33 ¶ 62).   Other business units had similar reductions in force.   Id.

[15]Because the facts and inferences from those facts must be viewed in the light most favorable to Mr. Cherry, the nonmoving party, the court includes the following disputed material facts submitted by plaintiff.   Matsushita Elec. Indus. Co., 475 U.S. at 587-88.

running and move on to another customer.   Id. ¶ 187.   Mr. Eide often shared his opinions with Mr. Raymer.   Id.

On February 26, 2009, Mr. Eide distributed to Mr. Cherry, Mr. Raymer and other field service engineers an e-mail containing a photograph of a grill in the shape of a handgun.   Id. ¶ 219.   The front of the photograph had the following notation:   "You must be a redneck if you own one of these.   Sign me up."   Id.   When Mr. Cherry asked Mr. Eide if he was a redneck, he replied "I kind of -- I can relate to some of Jeff Foxworthy's comments, I grew up in South Dakota in a rural area on a farm.   Most of us were probably born kind of -- with a redneck -- and [the] same thing with western South Dakota."   Id.

In March 2010 during a company dinner, Mr. Cherry was next to Mr. Siebert.   Id. ¶ 226.   Mr. Seibert asked a question regarding the new PRISM system.   Id.   As Mr. Cherry was explaining his thoughts about the system, he was rudely interrupted by Mr. Raymer who stated plaintiff never did anything right and if he would just do his work, he would get it done.   Id.   Mr. Cherry was upset by Mr. Raymer's comments and walked away.   Id.

During the training session which occurred the same week, Mr. Raymer asked Mr. Tuck, a Caucasian co-worker, to "make sure you take care of [Mr. Cherry] and make sure he gets to and from the meeting."   Id. ¶ 227.   Mr. Raymer's comment was made in front of Mr. Siebert and Mr. Cherry, as well as other co-workers.   Id.   Mr. Cherry felt embarrassed and humiliated by the comment.   Id.

13

Mr. Raymer typically used first names of other employees but when addressing plaintiff, Mr. Raymer often said " 'Mr. Cherry' in a very derogatory way, like you might as well have been using the N word."   Id. ¶ 229.   Mr. Cherry thought Mr. Raymer's tone of voice was very derogatory.   Id.

On March 26, 2011, Mr. Eide sent out an e-mail which showed the USS Ronald Regan as an aircraft carrier, the USS Bill Clinton as a smaller warship with a single airplane on it, and the USS Barack Obama with a jackass inside a small fishing boat and a declaration "Details are vague, but don't you worry, he has a plan."   Id. ¶ 220.   When asked about this e-mail Mr. Eide admitted he got a good laugh out of it and that he was entitled to his own opinion.   Id.

On Mr. Cherry's thirtieth anniversary with Siemens, Mr. Raymer sent a congratulatory e-mail to him.   (Docket 33 ¶ 130).   Included in the e-mail was a picture of Mt. Rushmore with Mr. Cherry's head superimposed over the head of President Washington.   (Dockets 33 ¶ 130; 47 ¶ 131).   Mr. Raymer testified he intended the e-mail to be congratulatory and complimentary.   (Docket 134). Mr. Cherry felt the e-mail was racially motivated because George Washington was a known slave owner.   (Docket 47 ¶ 131).   Mr. Cherry also felt the e-mail was discriminatory because it was different than the anniversary e-mails sent by Mr. Raymer to other employees.   (Docket 33 ¶ 132).   In those e-mails, the employees' pictures were superimposed on a motorcycle, car or snowboard.   Id.

On another occasion Mr. Cherry and his wife were seated with Mr. Eide at a company dinner.   (Docket 47 ¶ 222).   Mr. Eide was telling a derogatory story

14

about his daughter's significant other, who was African-American, and kept repeating over and over "but not because he's Black."   Id.   Mr. Eide's wife became embarrassed, took over and finished the story.   Id.

At a company dinner in September 2011, Mr. Cherry was with Mr. Raymer, Mr. Eide and two other employees from the Centaur Implementation team.   Id. ¶ 224.   Mr. Raymer made the comment, "I wish you were more like Dave Eide." Id.   When Mr. Cherry asked for an explanation, Mr. Raymer paused for a long time and said "ride a motorcycle."   Id.   Mr. Cherry felt everyone at the table was astonished by these comments and he left shortly thereafter.   Id.

When asked if he ever complained to Siemens or HR, Mr. Cherry testified "I was afraid of my job.   I just wanted to . . . take the whipping and just go back to work is what I did."   Id. ¶ 230.   Because of a previous comment by Mr. Raymer, plaintiff felt he would be "thrown under the bus [Mr. Raymer's words]."   Id.   Mr. Cherry felt he had "no hope of surviving something like that."   Id.   Mr. Cherry never filed a complaint with HR or anyone in Siemens.   (Docket 33 ¶ 3).

Mr. Raymer testified he was aware of complaints from Mr. Eide pertaining to plaintiff's work ethic, skills or qualities as an employee.   (Docket 47 ¶ 191). Mr. Raymer admitted he never independently verified Mr. Eide's complaints about plaintiff.   Id.   Mr. Raymer acknowledged his criticism of plaintiff's performance improvement efforts was almost continual.   (Docket 47 ¶ 231). On June 23, 2010, Mr. Raymer issued a warning letter to Mr. Cherry.   Id.   The areas needing improvement were:   (1) closing calls in a timely manner; (2)

completion of compliance training; (3) MOD documentation; (4) Kronos documentation; (5) expense reporting; and (6) call escalation.   Id.   Mr. Cherry's response to each of these directives is summarized:

(1)   Mr. Cherry had constant problems with his equipment, particularly the new Prism device which came out earlier that year.   He thought his service calls were closed as the system showed them as closed.   Later he received a report or a call from Mr. Raymer and found out the calls were not closed.   Mr. Cherry would then go back and address the unclosed service call issue. Id. ¶ 232;

(2)   Mr. Raymer knew plaintiff completed compliance training but could not print the certificates because of his computer problems.   After several printing attempts Mr. Cherry submitted the certificates to the training department.   Id. ¶ 233;

(3)   Mr. Cherry completed most of his MODs, but because of his computer problems could not either access the MOD to complete it or log the completion information on the system.   Id. ¶¶ 234-35;

(4)   Mr. Cherry claimed the KRONOS system was plagued with authorization errors.   Because of equipment malfunction issues, he could not always accurately record service call time.   Mr. Cherry claimed he was completing service calls, but documenting the work was either late or could not be done because of his computer issues.   Id. ¶ 236;

(5)   Because of his computer problems, Mr. Cherry had the same reporting difficulties with his expense reports. He worked with the help desk several times a day seeking assistance with the problem.   Id. ¶ 237; and

(6)   Mr. Cherry disputed the charge he failed to properly escalate service calls.   His 2009 performance evaluation indicated he "escalates situations appropriately . . . ."   Mr. Cherry addressed the issue with Regional prior to his performance review, tests

16

indicated the system was fully operational, and he
informed both Mr. Raymer and Mr. Eide of this.   Id.
¶ 238.

Mr. Cherry did not talk with either Mr. Siebert or Judy Bowers of HR about the

warning letter, even though the letter indicated both of them received copies.

(Docket 33 ¶¶ 126-27).   Unless further improvement plan steps are instituted, a

performance improvement plan expires 45 days after its issue date.   (Docket 47

¶ 267).   Mr. Cherry's performance improvement plan expired on or about

August 8, 2010.   Id.; see also id. ¶¶ 283-84.

Mr. Cherry asked Mr. Raymer and the help desk for a new computer all the

time.   Id. ¶ 245.   Mr. Cherry blames his issues with paperwork, call cycle times,

arrival times, time reporting, and untimely processing of his performance review

on problems with his laptop.   (Docket 33 ¶ 46).   Mr. Raymer testified he did not

have to sign off on a new computer for Mr. Cherry because that was a function of

the help desk.   (Docket 47¶ 258).   Mr. Siebert testified the help desk could not

order a new computer because that type of request needed to be made by a

manager such as Mr. Raymer.   Id. ¶ 259.   When Mr. Eide reported his

computer problems to Mr. Raymer, a new computer was delivered the next day.

Id. ¶ 258.   Mr. Cherry asked for a new computer for three years and finally got

one two weeks before his termination.   Id. ¶ 249.

Rapid City Regional Hospital was among the top ten customers for

Siemens in the entire Central Region and the largest account in South Dakota.

Id. ¶ 195.   When Mr. Raymer suggested removing Mr. Cherry and making Mr.

17

Eide the primary service technician for the hospital laboratory, the hospital flatly refused.   Id.

Internal Siemens' reports for April 2010 and June 2011 identifying the bottom three field engineers in the Central Region included Mr. Eide as the lowest rated field engineer.   Id. ¶ 210.   Mr. Cherry was not on the list.   Id.   A later draft of the June 2011 report identified Mr. Eide as the second lowest rated engineer and Mr. Cherry as the lowest rated engineer in the Central Region.[16] Id. ¶ 211.

As another example of his relationship with Mr. Raymer, Mr. Cherry described an event in September 2011.   Mr. Raymer traveled to Rapid City to assist with the installation of a piece of equipment known as a "StreamLab."   Id. ¶ 201.   Siemens' Centaur equipment was supposed to be set up to deliver samples to StreamLab.   Id.   Although he was not trained on the Centaur equipment, Mr. Cherry worked all night on the unit and ran into issues with the new equipment.   Id.   At 5 a.m., Mr. Cherry left a message on Mr. Raymer's cell phone about the difficulties being encountered and seeking assistance.   Id.   Mr. Raymer did not return Mr. Cherry's call until about 9 a.m. after Mr. Raymer was already on the road back to Minneapolis.   Id. ¶ 202.   Mr. Cherry felt this response was a slight from his supervisor as Mr. Raymer was in Rapid City to work on this project and should have assisted plaintiff with the equipment

---

[16]Neither party provided any factual information explaining this change.

installation.   Id.   Mr. Cherry felt he was being set up to fail by Mr. Raymer.   Id. ¶ 203.

Mr. Raymer frequently complained to Mr. Eide and other Siemens' employees about Mr. Cherry not getting his administrative work completed in a timely fashion.   Id. ¶ 205.   In the year or so preceding his termination, Mr. Cherry was described as a problem employee.   Id.   Mr. Siebert testified Mr. Raymer frequently make negative comments about plaintiff's lack of the ability to complete his administrative responsibilities.   Id. ¶ 207.   Mr. Siebert agreed it was fair to say Mr. Raymer was not giving Mr. Cherry the benefit of the doubt at that point in time on anything regarding plaintiff's equipment problems.   Id.

On September 9, 2011, Mr. Siebert sent an e-mail to Mr. Raymer asking for an Excel spread sheet on employees in the Central Region with current performance improvement plans.   Id. ¶ 214.   That evening Mr. Raymer sent Mr. Siebert an Excel spread sheet listing Mr. Cherry as the only employee on a current performance improvement plan even though it had expired in mid-August 2011.[17]   Id. ¶ 267.

On October 15, 2011, Mr. Siebert sent an e-mail asking for 2011 performance evaluations ("PMPs") for Mr. Raymer's employees.   Id.   In his response that same day, Mr. Raymer forwarded Mr. Cherry's PMP.   Id. ¶ 218.

---

[17]Mr. Eide received a warning letter from Mr. Raymer on May 26, 2010, for his on-the-job driving record.   (Docket 47 ¶ 285).   This performance improvement plan expired on or about July 11, 2010.   It was not forwarded by Mr. Raymer to Mr. Siebert.

In the e-mail Mr. Raymer stated, "I saved Farrell [Cherry] for last . . . well actually I had to, as it took constant asking for his PMP form.   His personal perspective pretty much sums up the quality of all he does."   Id.   In making his decision to include Mr. Cherry in the RIF, Mr. Siebert relied on Mr. Raymer's 2011 performance review of Mr. Cherry.[18]   Id.

Once Mr. Siebert developed his RIF list, he shared the information with Mr. Camela and Mr. Bolinger.   Id. ¶ 269.   Mr. Bolinger asked Mr. Siebert about any written confirmation two employees were retiring and verifying Mr. Cherry was on a written performance improvement plan.   Id.   According to Mr. Bolinger, performance improvement status was not a criteria for preparation of the RIF. Id. ¶ 270.   Mr. Camela never informed Mr. Bolinger that Mr. Cherry had more seniority than Mr. Eide or that Mr. Cherry could fix more instruments than Mr. Eide.   Id. ¶ 272.   Mr. Bolinger would only consider seniority if there was a tie to the performance evaluation criteria.   Id. ¶ 275.   As a secondary criteria, if one employee had longer tenure, the newest employee would be slated for termination.   Id.   Mr. Bolinger never considered having an outsider independently verify the RIF process for fairness and objectivity.   Id. ¶ 274.

As early as 1982, Mr. Cherry received written notifications from and had discussions with his then-supervisor Mike Watrak regarding the "big problem" of

---

[18]Mr. Cherry does not believe Mr. Siebert did anything to him which was racially discriminatory.   (Docket 33 ¶ 100).   Mr. Cherry asserts, by Mr. Siebert accepting Mr. Raymer's negative and derogatory portrayal of plaintiff, the two of them were acting in concert, whether consciously or unconsciously, resulting in a discriminatory act.   (Docket 47 ¶ 100).

"timely submission of required paperwork and reports."[19]   (Docket 33 ¶ 9). Mr.
Cherry's 1982 performance review noted he "must improve in all areas of
paperwork," including accuracy, completeness, and timeliness; his
organizational skills were a shortcoming; and he did not react well to
constructive criticism, making it difficult to solve problems.   Id. ¶ 14.   On
September 22, 1983, Mr. Watrak issued a written warning to Mr. Cherry because
of his poor paperwork habits and placed him on a period of probation, during
which he was required to timely and accurately submit his paperwork, as
"paperwork drives the payroll system, properly records expenses and generates
billings," and is therefore "an important part of [Mr.] Cherry's job."   Id. ¶ 11.

Mr. Cherry's problems with administrative duties and paperwork
continued to surface through the 1980s, 1990s, and 2000s.   Id. ¶ 16.   Wayne
Bath, another former supervisor, spoke with Mr. Cherry about late paperwork,
the need to improve the accuracy of paperwork and the need to prioritize his time
to ensure paperwork was completed.   Id. ¶ 15.   On May 11, 1990, Mr. Cherry
was issued another written warning in connection with his untimely and
inaccurate administrative duties.   Id. ¶ 17.   Mr. Bath's March 2001 annual
review of Mr. Cherry noted his "remaining obstacle continues to be
administrative performance, specifically, meeting deadlines related to certain
reports and functions."   Id. ¶ 18.   Mr. Bath advised Mr. Cherry his "primary

---

[19]Ordinarily, historical performance evaluations would not be pertinent.
Because plaintiff raises an issue about Mr. Raymer's objectivity in evaluating Mr.
Cherry, his challenge makes these historical evaluations relevant to the analysis.

areas of focus" in 2001 should include a goal to "meet all administrative deadlines—especially those related to call closure and expense reporting."   Id.

Mr. Cherry never perceived Mr. Bath's comments to be racist but as supportive in helping improve his work performance.   Id. ¶ 19.   Mr. Cherry admits having issues with not completing paperwork in a timely fashion before being supervised by Mr. Raymer.   Id. ¶ 35.   Mr. Cherry believes his heavy workload and having a large territory were the cause of these earlier problems. Id. ¶ 36.

## DISCUSSION

"Title VII of the Civil Rights Act of 1964 (Title VII) makes it an unlawful employment practice for an employer to 'discharge any individual . . . because of such individual's race, color, religion, sex, or national origin.' "   Twymon v. Wells Fargo & Co., 462 F.3d 925, 933 (8th Cir. 2006) (citing 42 U.S.C. § 2000e-2(a)(1)). For Mr. Cherry "[t]o establish a prima facie case of race discrimination, [he] must show that [he]: (1) is a member of a protected class; (2) was meeting [his] employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly–situated employees who were not members of [his] protected class."   Norman v. Union Pacific R.R. Co., 606 F.3d 455, 461 (8th Cir. 2010).

To survive defendant's motion for summary judgment, Mr. Cherry has two avenues available to him.   "The first is by proof of 'direct evidence' of discrimination."   Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir.

22

2011 (*en banc*) (citing <u>Griffith v. City of Des Moines</u>, 387 F.3d 733, 736 (8th Cir. 2004)).   "[D]irect evidence is evidence showing a specific link between the alleged discriminatory animus and the challenged [conduct], sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."   <u>Id.</u> (citing <u>Griffith</u>, 387 F.3d at 736) (additional internal citation and quotation marks omitted). " '[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence."   <u>Id.</u> (citing Griffith, 387 F.3d at 736).   "[I]f the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the <u>McDonnell Douglas</u>[20] analysis, including sufficient evidence of pretext."   <u>Id.</u> (citing <u>Griffith</u>, 387 F.3d at 736).

Under the burden-shifting framework of <u>McDonnell Douglas</u>, "a Title VII plaintiff has the initial burden of establishing a prima facie case of race discrimination."   <u>Rose-Maston v. NME Hosps., Inc.</u>, 133 F.3d 1104, 1107 (8th Cir. 1998).   If Mr. Cherry "is successful in establishing a prima facie case, a rebuttable presumption of discrimination arises."   <u>Id.</u>   "The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for the adverse employment action."   <u>Id.</u>   The employer's "burden to articulate a nondiscriminatory justification is not onerous, and the explanation need not be demonstrated by a preponderance of the evidence."   <u>Rodgers v. U.S. Bank, N.A.</u>,

---

[20]<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973).

417 F.3d 845, 853 (8th Cir. 2005) (internal citation and quotation marks omitted) *abrogated on other grounds by* Torgensen v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011).   "Once the employer articulates such a reason, the presumption of discrimination disappears entirely and the plaintiff bears the burden of proving that the employer's proffered reason is merely a pretext for discriminatory animus."   Rose-Maston, 133 F.3d at 1107.   "[T]he ultimate burden falls on [Mr. Cherry] to produce evidence sufficient to create a genuine issue of material fact regarding whether [the employer's] proffered nondiscriminatory reason is a pretext for discrimination."   Rodgers, 417 F.3d at 853.

"There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext."   Torgerson, 643 F.3d at 1047.   First, "that the employer's explanation is unworthy of credence . . . because it has no basis in fact."   Id.   "Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer."   Id.   "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action."   Id.

"Proof of pretext, coupled with a strong prima facie case, may suffice to create a triable question of fact."   Id. at 1046.   "To defeat summary judgment, [Mr. Cherry] must produce sufficient evidence from which a reasonable factfinder could infer discrimination."   Id. at 1050.

24

"At the prima facie stage of the <u>McDonnel Douglas</u> burden-shifting framework, [the court uses a] low-threshold standard for determining whether employees are similarly situated." <u>Rodgers</u>, 417 F.3d at 852. "The burden of establishing a prima facie case of disparate treatment is not onerous." <u>Id.</u> (citing <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)). Under either test, plaintiff must show he suffered an "adverse employment action." <u>Norman</u>, 606 F.3d at 460. Without question, termination is an "adverse employment action." <u>Id.</u>

Concerning Mr. Cherry's claim, "[a]n employee may establish unlawful employment discrimination through direct or indirect evidence." <u>Takele v. Mayo Clinic</u>, 576 F.3d 834, 838 (8th Cir. 2009) (internal citation omitted). Evaluating a direct evidence claim, the court "appl[ies] the mixed-motives analysis of <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228 (1989) . . . ." <u>Yates v. Douglas</u>, 255 F.3d 546, 548 (8th Cir. 2001). "To be entitled to this direct-evidence analysis, however, [plaintiff] must present 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision.'" <u>Id.</u> at 548-49 (quoting <u>Rivers-Frison v. Southeast Missouri Community Treatment Ctr.</u>, 133 F.3d 616, 619 (8th Cir.1998) (citation omitted)).

Mr. Cherry signed off on his 2011 performance evaluation. Whether he did so with full knowledge of the contents of the evaluation or simply because he

25

was too busy to read the document does not change the analysis.   Because he did not object to or comment upon his evaluation, there was no reason for Mr. Siebert to know or suspect that Mr. Raymer may have consciously or subconsciously given Mr. Cherry a negative evaluation, in whole or in part, because of his animus toward plaintiff, an African-American.

Mr. Siebert was the decisionmaker as to which employees in his unit would be terminated under the RIF.   Mr. Cherry acknowledges Mr. Siebert made no discriminatory statements about him.   Rather, Mr. Cherry seeks to attach any allegedly improper statements or actions by Mr. Raymer to Mr. Siebert either by conscious or unconscious concert.   (Docket 46 at pp. 23 & 33).

" '[D]irect evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.' "   Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 635 (8th Cir. 1998) (quoting Price Waterhouse, 490 at 277).   "[N]o reasonable fact-finder could find that the comments in question are direct evidence that race discrimination actually motivated [Siemen's] decision to terminate [Mr. Cherry]."   Putman v. Unity Health Systems, 348 F.3d 732, 735 (8th Cir. 2003).   Mr. Cherry presents no direct or indirect evidence of discrimination.   The court must apply the McDonnell Douglas framework.   Id.

Under the burden shifting framework of McDonnell Douglas, Mr. Cherry "has the initial burden of establishing a prima facie case of race discrimination." Rose-Maston, 133 F.3d at 1107.   "To present a prima facie case of

26

discriminatory discharge, [plaintiff] was required to show 'that [he] was a member of a protected class, that [he] was qualified for the position, and that despite [his] qualification [he] was [terminated].' " Id. at 1008 (citing Ruby v. Springfield R–12 Public School District, 76 F.3d 909, 911 (8th Cir. 1996). "In reduction-of-force cases, [the court] require[s] 'some additional showing' that discrimination was a factor in the termination." Putman v. Unity Health System, 348 F.3d 732, 736 (8th Cir. 2003). For purposes of the summary judgment analysis, the court will presume Mr. Cherry's evidence establishes a prima facie case, "thus creating a rebuttable presumption of discrimination." Rose-Maston, 133 F.3d at 1107.

The burden under McDonnell Douglas then shifts to Siemens "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Colenburg, 619 F.3d 986, 992 (8th Cir. 2010) (internal citation omitted). The court does "not sit as a super-personnel department to review the wisdom or fairness of [Siemens'] job-elimination policies during the RIF." Wallace v. Sparks Health System, 415 F.3d 853, 860 (8th Cir. 2005).

Siemens presented undisputed financial and statistical evidence indicating the RIF was conducted for legitimate business reasons on a nondiscriminatory basis. Colenburg, 619 F.3d at 992. Siemens showed its decision to terminate Mr. Cherry as part of the RIF was "racially neutral, fair and based on business necessity." Henry v. Ford Motor Co., 553 F.2d 46, 49 (8th Cir. 1977) (internal reference omitted). "A proffered legitimate, non-

27

discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination." Twymon, 462 F.3d at 935.

"When an employer articulates a nondiscriminatory reason for an employee's discharge . . . the factual inquiry proceeds to a new level of specificity."   Rahlf v. Mo-Tech Corp., 642 F.3d 633, 638 (8th Cir. 2011) (internal quotation marks omitted).   "To prove pretext, a plaintiff must both discredit an employer's asserted reason for termination and show that the circumstances permit drawing the reasonable inference that the real reason for terminating the plaintiff was [his] race."   Twymon, 462 F.3d at 935.   Mr. Cherry "must produce some evidence creating a genuine issue of fact as to whether . . . [Siemens'] harbored a discriminatory intent."   Johnson v. Baptist Medical Center, 97 F.3d 1070, 1073 (8th Cir. 1996).   See also U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715 (1983) ("The factual inquiry in a Title VII case is whether the defendant intentionally discriminated against the plaintiff.") (internal quotation marks omitted).

Mr. Cherry claims his supervisor Mr. Raymer and co-worker Mr. Eide were racially discriminatory on an "unconscious" level.   (Docket 46 at p. 23).   Mr. Cherry argues "the selection of Plaintiff as one of the employees to be terminated . . . . [was] motivated by racial animus from both his supervisor Raymer and from his co-worker Eide, acting separately and in concert with each other—even if their cooperation was partially conscious and partially unconscious, and/or if it was out of a shared belief about white privilege or negative feelings about African-Americans, and/or with different intent as to the results."   Id.   Plaintiff

28

continues the argument by asserting "Raymer's (and Eide's) under-the-radar campaign in the evaluations and warning letter/performance improvement plan of 2010 helped Siebert and Camela to be able to suggest that they had no clue anything unlawful was occurring—and that the RIF was just based on 'neutral criteria.' " Id. at p. 33.

An argument of subjective, subconscious discrimination by one or more lower level employees of Siemens, without supporting evidence showing an intentional discrimination by decisionmakers Mr. Siebert and Mr. Camela, cannot satisfy plaintiff's obligation to show the employer's reasons for including Mr. Cherry in the RIF were pretextual.   Mr. Cherry has not discredited Siemens' decision to include him in the RIF.   Finally, Mr. Cherry failed to create a material "genuine issue of fact" that Siemens "harbored a discriminatory intent" and that his "termination was truly racially motivated."   Johnson, 97 F.3d at 1073; Twymon, 462 F.3d at 936.

## ORDER

Based on the above analysis, it is hereby

ORDERED that defendant's motion for summary judgment (Docket 31) is granted.

IT IS FURTHER ORDERED that plaintiff's amended complaint (Docket 8) is dismissed with prejudice.

Dated March 31, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE

29